IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Buddy R. Allen, | : | |
| Plaintiff, | : | Civil Action 2:12-cv-00619 |
| v. | : | Judge Graham |
| Carolyn Colvin, | : | Magistrate Judge Abel |
| Commissioner of Social Security, | | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

Plaintiff Buddy R. Allen brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits.  This matter is before the Magistrate Judge for a report and recommendation on the administrative record and the parties' merits briefs.

**<u>Summary of Issues</u>.**  Plaintiff Allen maintains that he became disabled on January 1, 2008, at age 36, due to left knee ACL (anterior cruciate ligament), cut tendons on his right hand, back problems and depression.  (*PageID* 165.)

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's determination of plaintiff's physical residual functional capacity violated the treating physician rule and lacked the support of substantial evidence;

- The administrative law judge's determination of plaintiff's mental residual functional capacity violated  Social Security Ruling ("SSR") 96-6p and lacked the support of substantial evidence.

**Procedural History.**  Plaintiff Allen protectively filed his application for supplemental security income on August 27, 2008, alleging that he became disabled on January 1, 2008, at age 36.  (*PageID* 145-47.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On October 27, 2010, an administrative law judge held a video hearing at which plaintiff, represented by counsel, appeared and testified.  (*PageID* 66-81.)  A vocational expert also testified.  (*PageID* 81-86.)  On October 28, 2010, the administrative law judge issued a decision finding that Allen was not disabled within the meaning of the Act.  (*PageID* 43-54.)  On May 31, 2012, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (*PageID* 34-37.)

**Age, Education, and Work Experience.**  Allen was born on July 30, 1971.  (*PageID* 145, 160.)  He has a high school education.  (*PageID* 171.)  Allen has past relevant work as a roofer, sandwich maker and stocker.  (*PageID* 166.)

**Plaintiff's Testimony**. The administrative law judge fairly summarized Allen's testimony as follows:

> The claimant testified that since his back injury from a 25-foot fall, he took pain medication and went back to work.  He finally obtained insurance through Care Source in January 2008, and then it "all snowballed" as he underwent surgical procedures.  His girlfriend and her mother now pay all household bills.  His back pain stays constant but some days and some positions are better than others.  His back is uncomfortable, requiring him to change positions.  He needs to elevate his feet about two hours each day, to take pressure off his back.  His back pain goes into his legs and his hips, more on the right, and his feet become numb.  He gets

muscle cramps some days.  He testified that he could sit about fifteen or twenty minutes without moving around.  He thought he could sit about two or three hours total in a day.  He could walk about 40 to 45 yards on a good day or about 20 to 25 yards on a bad day.  Out of an eight-hour day, he could walk or stand about four hours.  He would then need to stretch out.  He could lift twenty five to thirty pound if necessary, but not continuously and could not lift overhead because his right wrist gives out.  He stated that his carpal tunnel syndrome continues in spite of attempted surgical release; he cannot pick his thumb straight up, his thumb wallows around, his hand cramps and draws up, he has to rub it.  He cannot feel pressure sensations on the backside of his hand.  He might injure his hand and not know it.  He cannot pick up something small like a penny because his fingers will not work right.  His hand draws when he tries to write to complete papers after ten minutes or so.  He was prescribed morphine, Tramadol, and a muscle relaxer by his family physician, Dr. Olson, but is currently taking only Percocet prescribed by his orthopedic surgeon, Dr. Cassandra.

On a typical day, he watches television, walks around, and goes outside with his daughter.  He watches movies on television, like action movies.  He might try to do dishes once or twice a week.  He goes to the grocery with his girlfriend once a month.  He pushes the cart but must lean on the car.  His girlfriend bags and carries the grocery.  His girlfriend and her mother do most of the household chores.  He does not do any major cooking, he is afraid of dropping something or burning himself on the oven, but he does grill sometimes.  The claimant takes garbage out if it is not too heavy.  His brother-in-law cuts the grass.  The claimant is able to dress himself although he has trouble with buttons and zippers.  He takes baths, as they do not have a shower, but sometimes needs help getting out of the tub.  His girlfriend's family visits often, almost daily.  If people come over, he can tolerate them for a little while but gets frustrated and then must get away from them.  It bothers him when people talk about work or going fishing or hunting because he cannot do those things any longer.  He had a problem with use of alcohol in his younger days, but no longer drinks as he did then.  He drank two or three beers the weekend before the hearing while sitting around and talking to his girlfriend's cousins.  He had not had marijuana in two years as he cannot have that in his system and still get pain medications.  He has a bad day at least every other day and lies down for three or four hours.  Sometimes he lies on a flat hard surface such as the floor in the living room to alleviate his back pain.

(*PageID* 49-50.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

**Physical Impairments.**

Kevin Olson, D.O.  Allen began treating with primary care physician, Dr. Olson on May 30, 2007. (*PageID* 448.) An MRI taken of Allen's lumbar spine on September 20, 2007 showed protrusion of the L4-5 disc with mild canal stenosis, grade I anterolisthesis of L5 on S1 with moderately severe facet degenerative changes, and L5-S1 disc extrusion with mild spinal stenosis, severe lateral recess stenosis with displacement of the right S1 nerve root, moderate to severe right sided foraminal stenosis, and somewhat developmentally small lumbar canal throughout.  (*PageID* 260.)

On April 28, 2009, Eric Chilton, PA-C, Dr. Olson's physician's assistant, listed Allen's diagnoses as a herniated disc at L5-S1, L3-4, chronic and morbid obesity.  Mr. Chilton reported that Allen was not a surgical candidate because he smoked a pack of cigarettes daily and had a body mass index of 43.  Allen continued to smoke and would not lose weight for repair of his lumbar spine problems.  Ms. Chilton concluded that Allen could sedentary work.  (*PageID* 449-51.)

On July 27, 2010, Dr. Olson completed a physical capacity evaluation on Allen's behalf.  Dr. Olson opined that Allen could stand, walk and sit for two hours in an 8 hour work day, lift up to ten pounds occasionally, could reach above shoulder level, could

4

bend and climb steps occasionally but could not perform grasping, pushing or pulling or fine manipulation, and cannot squat, crawl, or climb ladders. He could use his feet for repetitive movements as in operating foot controls. Dr. Olson further remarked that Allen was unable to sit or stand without breaks, that his knees and back "give" with stress, that his pain level decreases concentration and focus, that numerous breaks are needed, that his condition will worsen with age and physical activity, and that rehabilitation had failed and surgery was pending. Diagnoses included lumbar strain sprain, spinal stenosis, and glenoid tear of the left shoulder. (*PageID* 458-59.)

      <u>Specialized Orthopaedics & Sports Medicine.</u> Plaintiff was seen for evaluation of a left knee problem by J. Mark Hatheway, M.D. on July 12, 2007. (*PageID* 340.) Allen reported that he had a football injury to his left knee in 1986. He had arthroscopic surgery back then and he was told then that they took out some cartilage and he had some ligament problems. He states that he has had some problems with the knee over the years, but over the past three or four years he has had increasing problems with locking and episodes of the knee giving way. Examination showed a mild left knee effusion and positive anterior drawer sign and the Lachman test was mildly positive. On September 28, 2007, due to significant instability of his left knee and significant arthritic changes in the medial compartment, Allen underwent an arthroscopic surgical repair of left knee anterior cruciate ligament tear and partial medial meniscectomy, with removal of loose bodies performed. (*PageID* 342-43.)

      In December 2007, Allen reported he was not going to physical therapy but was

doing exercises at home; and on August 19, 2008, he reported that he had "jammed" his knee a month previously.  (*PageID* 329.)

Arthur Neil Cole, M.D.  Plaintiff began treating with neurosurgeon, Dr. Cole, on November 27, 2007.  Allen reported that he had had back pain for several years after falling about 25 feet.  He complained of difficulty walking and radiating pain in his right leg and hip with numbness and tingling in his right leg and foot.  (*PageID* 368.) Neurological examination revealed that Allen's sensation was decreased in the right S1 dermatome and straight leg raising was positive on the right side, but his coordination and gait were normal.  (*PageID* 366-37).

Dr. Cole performed a microdisectomy at L5-S1 on the right on January 17, 2008. (*PageID* 375-76.)  When Allen was discharged the following day, Dr. Cole noted his pain was improved and sensation and motor function were intact.  (*PageID* 248.)  Allen continued to complain of pain radiating to his left leg.  Dr. Cole ordered an MRI on Allen's lumbar spine to be certain he had not developed a new disk herniation on the left side.  (*PageID* 358.) The MRI taken on June 24, 2008 showed a developmentally small canal, stable broad-based central disc protrusion at L4-5, and right paracentral recurrent disc protrusion at L5-S1.  (*PageID* 390.) An EMG taken of the bilateral lower extremity on August 28, 2008, demonstrated mild chronic bilateral L5 and S1 radiculopathy. (*PageID* 389.)

On October 28, 2008, after having two epidural injections[1], Allen reported that he still had left leg pain and that the second epidural injection had caused increased pain. An examination was normal.  Dr. Cole recommended a lumbar discogram.  (*PageID* 395.)

A CT scan of the lumbar spine taken on December 16, 2008 showed disc space narrowing and mild facet degeneration at L5-S1.  (*PageID* 399.)

Orthopaedic Specialists of Central Ohio  Allen first saw Thomas Kovack, D.O. on October 25, 2007, with complaints of wrist pain, swelling, numbness, weakness, and tingling since an injury to the volar aspect of his right wrist with a piece of glass in 2000. (*PageID* 285-88.) Dr. Kovack found abnormal alignment of the 5th CMC (carpometacarpal) joint.  (*PageID* 287.)

Plaintiff was seen by Dr. Kovack on November 1, 2007 for low back pain.  Upon examination, plaintiff's lumbar range of motion was limited, with positive paraspinal tenderness.  Dr. Kovack assessed lumbar spine stenosis, degeneration and arthritis.  He prescribed Percocet and ordered physical therapy.  (*PageID* 292.)

A March 6, 2008, MRI of the right forearm showed edema and atrophy of the extensor compartment of the forearm with no mass.  (*PageID* 303-04.)

James Cassandra, D.O. performed a right carpal tunnel release and right forearm tendon transfer on March 20, 2008.  (*PageID* 272-73.)  Following this surgery and with

---

[1]Plaintiff received epidural steroid injections at L5-S1 on September 16, 2008 and October 7, 2008 from James Weiss, M.D. at the Orthopaedic & Spine Center.  (*PageID* 382-88.)

the help of physical therapy, Allen could extend his fingers and thumb, but he had a weaker extension of the thumb.  (*PageID* 324, 472.)

An MRI of Allen's shoulders taken on December 5, 2009, showed a tear of the right superior glenoid labrum and moderate degenerative in the both the right and left acromioclavicular joints and tendinosis without evidence of rotator cuff tear bilaterally.  (*PageID* 488-89.)  Dr. Cassandra injected cortisone in both shoulders. (*PageID* 492.) Dr. Cassandra performed arthroscopic surgery for rotator cuff surgery on Allen's right shoulder on September 7, 2010.  (*PageID* 521-22.)  When seen for follow-up on September 20, 2010, Dr. Cassandra noted he was doing well.  He complained of pain at 7/10.  (*PageID* 523.)

Christopher Vincent, D.O./Neurologic Specialists, Inc.  Dr. Vincent performed an electromyographic and nerve conduction study on  November 8, 2007, which showed radial nerve neuropathy distal to the elbow and mild to moderate carpal tunnel syndrome.  (*PageID* 294-95.)  When examined by Dr. Vincent, he found Allen's right hand was held in a flexed position with hypertrophy of the brachioradialis in the arm, atrophy of the extensor muscles of the hand, weakness of the muscles that extend the wrist and the fingers, and weakness in thumb abduction.  (*PageID* 294.)

On August 19, 2010, Allen complained to Dr. Vincent of numbness in his right palm.  Dr. Vincent found a decreased pin prick and light touch in plaintiff's right hand and weakness in plaintiff's right hand grip finger abduction and wrist extension.  He recommended that plaintiff follow up with Dr. Cassandra.  (*PageID* 525-26.)

8

Gerald Klyop, M.D./Diane Manos, M.D.  On December 17, 2008 , Dr. Klyop, a state agency physician, conducted a physical residual functional capacity assessment based on plaintiff's record.  (*PageID* 435-42.)  Dr. Klyop found that Allen retained the ability to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour work day, and push or pull was unlimited.  (*PageID* 436.)  He found Allen would be limited to frequently kneel.  (Page ID 437.)  Dr. Klyop further limited Allen to only frequently perform handling and fingering with the right upper extremity.  (*PageID* 438.)  Dr. Klyop concluded that Allen's symptoms were attributable to a medically determinable impairment.  Dr. Klyop found Allen's statements were partially credible.  (*PageID* 440.)  Another state agency physician, Dr. Manos affirmed Dr. Klyop's assessment in June 2009.  (*PageID* 456.)

Gary L. Rea, M.D.  Plaintiff saw Dr. Rea with complaints of back pain on May 22, 2009.  Upon examination, Allen had a full range of motion, normal strength, and intact reflexes in his arms, multiple positive Waddell's signs with simulated rotation, simulated compression, and severe tenderness.  Dr. Rea also noted Allen exhibited "a multitude of chronic pain behaviors, with groaning and slowness of movement."  Plaintiff's strength in his legs was normal.  Dr. Rea opined that plaintiff did not require surgery, and that plaintiff would receive more benefit with weight loss and exercise.  (*PageID* 468-69.)

9

On June 16, 2010, Dr. Rea noted that plaintiff had normal strength in his legs and a full range of motion in his hips and legs, but that plaintiff reported pain with "almost all movements" of his legs and exhibited tenderness in multiple areas.  Dr. Rea noted that Allen does have "symptoms that sound like stenosis." He ordered additional tests.  Dr. Rea cautioned Allen that, " I am not sure at all that surgery will make him better.  He has complaints and findings that look more like chronic pain than a surgical problem.  He and I had talked a year ago about stopping smoking, losing weight, and that those had as good a chance of making him better as surgery, and he really has not tried to do any of those.  However, that doesn't mean he doesn't hurt.  I cautioned him that smoking decreases the chance of a good outcome in surgery by 20%, as well." (*PageID* 463-64.)

When seen on August 6, 2010, Dr. Rea reported that plaintiff's straight leg raise test was negative and his reflexes were normal and symmetric.  Dr. Rea also found positive Waddell's signs of simulated compression and rotation causing pain.  Dr. Rea concluded that Allen's studies showed some degenerated disc and mild narrowing, but he opined that surgery would not help plaintiff's pain.  (*PageID* 461.)

**Psychological Impairments.**

Jeremy D. Kaufman, Psy.D.  Dr. Kaufman evaluated Allen on behalf of the Ohio Department of Jobs and Family Services on March 14, 2008.  (*PageID* 263-70.)  Allen indicated an episode consisting of irritable and depressed mood, feeling worthless, insomnia, suicidal ideation, anhedonia, occasional psychomotor retardation, and

decreased concentration.  (*PageID* 264.)  Allen also reported a history of drinking

heavily daily, nine DUIs, and at the time of the examination, he was drinking on the

weekends, smoking marijuana occasionally and smoking up to two packs of cigarettes a

day.  (*PageID* 265.)  He appeared to be agitated and irritable but with no indications of

anxiety; his thought processes seemed clear and coherent and thought content within

normal limits.  (*PageID* 266.)  Personality and symptom inventories were in the clinical

range for anxiety and depression and were borderline clinical range for alcohol and

substance use.  (*PageID* 266-67.)  Dr. Kaufman diagnosed a major depressive disorder,

single episode, moderate; alcohol dependence; and cannabis dependence.  He assigned

Allen a Global Assessment of Functioning ("GAF") score of 55.  Dr. Kaufman concluded

that "from a purely psychological perspective, [plaintiff] is unemployable."  (*PageID*

267.)

Dr. Kaufman also completed a  Mental Functional Capacity Assessment wherein

he found Allen was markedly impaired in his ability to perform activities with a

schedule and be punctual, the ability to work in coordination or proximity with others

without being distracted by them, the ability to interact appropriately with the general

public, the ability to accept instructions and respond appropriately to criticism from

supervisors, the ability to get along with coworkers or peers without distracting them or

exhibiting behavior extremes, and the ability to maintain socially appropriate behavior

and to adhere to basic standards of neatness and cleanliness.  Dr. Kaufman found Allen

was moderately impaired in his ability to sustain an ordinary routine without special

supervision, to make simple work-related decisions, to ask simple questions or request assistance, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others, to understand, remember, and carry out detailed instructions and to maintain concentration for extended periods, but no significant impairment of ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions.  (*PageID* 269.)

Allan Rain, M.A.  Psychologist Allan Rain performed a consultative psychological examination at the request of the Bureau of Disability Determination on October 27, 2008.  (*PageID* 403-08.) Allen reported no history of alcohol or drug involvement.  (*PageID* 405.)  On mental status examination, his affect was flat, he had difficulty concentrating and comprehending during the examination.  Allen exhibited sad and withdrawn behavior.  (*PageID* 405-06.) Mr. Rain noted that Allen was oriented times two, exhibited problems not only with computation but also with recall and concentration, and could not provide the meaning of either proverb asked of him. (*PageID* 406-07.) Mr. Rain noted that Allen's transposition of numbers during the Digit Span test raised the possibility of an organic mood disorder, "particularly in light of the two substance abuse diagnoses provided by [Dr. Kaufman]."  (*PageID* 407.)  Mr. Rain diagnosed a dysthymic disorder and assigned him a GAF score of 50 but noted that from a functional perspective Allen's GAF score was 75.  (*PageID* 408.)  Mr. Rain opined that Allen was markedly impaired in his abilities to: relate to others, including

12

co-workers and supervisors; understand and carry our simple instructions; maintain attention, concentration, persistence and pace to tend to simple, repetitive tasks; and withstand the stressors and pressures associated with daily and work life. (*PageID* 407-08).

Irma Johnston, Psy.D./Carl Tishler, Ph.D. After her review of the record on November 19, 2008, state agency psychologist, Dr. Johnston, reported that medically determinable impairments of major depressive disorder and dysthymic disorder, alcohol dependence and cannabis dependence were present, but were not severe. (*PageID* 412, 417.) Dr. Johnston opined that Allen was mildly limited his activities of daily living, moderately limited in maintaining social functioning and in maintaining concentration, persistence or pace, and no episodes of decompensation. (*PageID* 419.) Dr. Johnston further determined that the evidence did not establish the presence of the "C" criteria. (*PageID* 420.) Dr. Johnston reported that the field office claims representative, "noted no problems in the face to face interview. Claimant was cooperative, pleasant and responsive." (*PageID* 425.) Dr. Johnston gave Mr. Rain's assessment only limited weight given the differences in Allen's appearance between the two examinations. (*PageID* 425.) When discussing Dr. Kaufman's findings, Dr. Johnson noted that Allen presented with a "different presentation" to Dr. Kaufman and when considering all the evidence and documentation, moderate limitations in work related functioning are more appropriate. (*PageID* 425-26.) Dr. Johnston concluded that Allen could understand, recall and perform simple repetitive tasks on a routine basis, and that

he could adapt to "a relatively static work like setting where there are no strict

production quotas and where the required interactions with others are minimal."

(*PageID* 426.)  In April 2009, Dr. Tishler, another state agency psychologist, affirmed Dr.

Johnston's assessment.  (*PageID* 446.)

**Administrative Law Judge's Findings.**  The administrative law judge found that:

1.  The claimant has not engaged in substantial gainful activity since August 27, 2008, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: obesity, degenerative disc disease of the lumbar spine, residuals of tendon transfer and carpal tunnel repair on the right, and depression (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part  404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, [the administrative law judge] find[s] that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except with no more than frequent kneeling, no more than frequent gross and fine manipulation with the right dominant hand, no more than simple, routine, repetitive tasks with no production rate or pace work and no more than occasional interaction with the public and with coworkers.

5.  The claimant  is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on July 30, 1971 and was 37 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 27,2008, the date the application was filed (20 CFR 416.920(g)).

(*PageID* 61-68, citation to record omitted.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Allen argues that the decision of the Commissioner

15

denying benefits should be reversed because:

• The administrative law judge's determination of plaintiff's physical residual functional capacity violated the treating physician rule and lacked the support of substantial evidence. Plaintiff contends that the administrative law judge's analysis of Dr. Olson's opinion was procedurally deficient. Specifically, plaintiff argues the administrative law judge failed to mention the Section 1527(c) factors, other than the existence of a treating relationship; failed to analyze why Dr. Olson, as the sole treating source opinion of record, was not granted controlling weight; and failed to provide any reasons, good or otherwise, for giving "little weight" to Dr. Olson's opinion. Plaintiff also contends that the administrative law judge's adoption of Dr. Klyop and Dr. Manos, the state agency physicians opinions, over Dr. Olson's opinion violated SSR 96-6p. (Doc. 10 at *PageID* 584-90.)

• The administrative law judge's determination of plaintiff's mental residual functional capacity violated SSR 96-6p and lacked the support of substantial evidence. Plaintiff argues that the weight of the psychological evidence on the whole supported the limitations of the examining psychologists, Dr. Kaufman and Mr. Rain. The administrative law judge sought instead to rely upon the opinion of Dr. Johnston, a non-examining source. According to Allen, the mental residual functional capacity determination in this case violated SSR 96-6p, failed to accord the best longitudinal evidence of record, and lacked the support of substantial evidence. (Doc. 10 at *PageID* 590-94.)

16

**Analysis.**

In his first assignment of error, plaintiff complains that the administrative law judge improperly rejected the opinion of his treating physician, Dr. Olson.

<u>Treating Physician: Legal Standard.</u>  A treating doctor's opinion[2] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments.  20 C.F.R. § 416.927(c)(2)[3].  When the treating doctor's opinion "is well-supported by medically

---

[2]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).  Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2.  When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.,* the error is *de minimis; see Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).  So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 416.927(d)(2) but does not technically meet all its requirements.  *Id.*

[3]20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at 20 C.F.R. §§ 404.1527(d) and 416.927(d).

17

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " Id.

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A).  Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence.  *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004);*Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §416.913(b), (c), (d), 416.926(b), and 416.927[4].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 416.927(c)(1). When a treating source's

---

[4]Section 416.927(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.(*See* §416.905.) Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. (*See* §416.908.)

18

opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  20 C.F.R. § 416.927(c)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 416.927(d)(1).

SSR 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."  Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify."  *Id.*  When the treating source's opinion "is well supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ." The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion. When the doctor has treated the claimant long enough "to have

obtained a longitudinal picture of your impairment, we will give the source's [opinion] more weight than we would give it if it were from a non-treating source." 20 C.F.R. §416.927(c)(2)(i).

The Commissioner has issued a policy statement about how to assess treating sources' medical opinions.  SSR 96-2p emphasizes:

1.  A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2.  Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3.  Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4.  Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5.  The judgment whether a treating source's medical opinion is well supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7.  A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 416.927(c)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004). Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson*, 378 F.3d at 544; *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable

21

presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007); *Hensley*, above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security*, 375 F.3d at 390; *Walker v. Secretary of Health & Human Services*, 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

<u>Treating Doctor: Discussion</u>. With respect to the opinion of Dr. Olson, the administrative law judge stated:

> As for the opinion evidence, little weight is given to the opinion of Dr. Olson, who the claimant testified has been his primary physician for four or five years. Dr. Olson completed a form on July 27, 2010 indicating that the claimant can stand two hours, walk two hours, sit two hours, lift up to ten pounds occasionally, but can use feet for operating foot controls, can reach above shoulder level, can bend and can climb steps occasionally but cannot perform no grasping, pushing or pulling or fine manipulation, and cannot squat, crawl, or climb ladders (Exhibit 20F). Dr. Olson further remarked that the claimant is unable to sit or stand without breaks, that his knees and back "give" with stress, that the claimant's pain level decreases concentration and focus, that numerous breaks are needed, that his condition will worsen with age and physical activity, and that rehabilitation has failed and surgery is pending; diagnoses included lumbar strain sprain, spinal stenosis, and glenoid tear of the left shoulder (Exhibit 20F p 3). A form completed and signed by a physician's assistant in Dr. Olson's office on April 28, 2009 shows that the claimant was first seen in that office on May 30, 2007 that diagnoses were" HNP L5-S1, L3-4, chronic" and "morbid obesity," that the claimant is not a surgical candidate because he smokes a pack of cigarettes daily and has a body mass index of 43, that the claimant's only prescribed therapy was medication not prescribed from that office, and that the claimant may do sedentary work (Exhibits 16F and 17F). That form also referenced notes that were not attached.

(*PageID* 51.)  Plaintiff argues that "the ALJ stated no reasons, let alone good reasons, for effectively rejecting Dr. Olson's opinion." (Doc. 10 at *PageID* 587.)  The administrative law judge's reasons for assigning "little" weight Dr. Olson's opinions is supported by substantial evidence.  The administrative law judge properly noted that Dr. Olson's opinion was internally inconsistent.  (*PageID* 51.)  As noted above, Dr. Olson opined that Allen could only stand, walk, or sit for two hours each in an eight-hour day, with breaks, and only lift up to 10 pounds occasionally.  (*PageID* 458-59.)  However, Dr. Olson offered no objective findings to support his opinion and his opinion is inconsistent with the questionnaire completed by the physician assistant in Dr. Olson's office, Eric Chilton. In April 2009, Mr. Chilton reported that Allen was not a candidate for surgery and that his only therapy was medication that was not prescribed by Dr. Olson's office. (*PageID* 450-51.)

Contrary to plaintiff's argument, Dr. Rea's treatment notes do not support Dr. Olson's opinion, and rather, lend support to the administrative law judge's finding. Specifically, a review of Dr. Rea's office notes reflect that in August 2010, he found plaintiff's straight leg raise test was negative, his reflexes were normal and symmetric and he found positive Waddell's signs.  (*PageID* 461.)  Dr. Rea's treatment notes also reveal that plaintiff exhibited signs of symptom exaggeration.  (*PageID* 461, 464, 468.)

Similarly, Dr. Cassandra, who performed a right carpal tunnel release and right forearm tendon transfer, reported by October 2010 that plaintiff was doing well.

(*PageID* 324, 472.)  Dr. Olson's opinion was also contradicted by Dr. Cole's examination findings and with Dr. Weiss' September 2008 assessment.  (*PageID* 355, 383, 395.)  Dr. Olson's report was particularly inconsistent with Dr. Cole's indication that plaintiff's right leg pain had been completely resolved, with the MRI findings, CT scan, and EMG results that demonstrated only mild abnormalities.  (*PageID* 245, 355, 570.)

Plaintiff also argues the administrative law judge cannot rely on the opinions of reviewing physicians to justify his residual functional capacity assessment.

With respect to Dr. Klyop and Dr. Manos, the administrative law judge stated:

> Great weight is given to the opinion of the State agency physicians, Dr. Klyop and Dr. Manos who reviewed all the records available on December 17, 2008 and June 30, 2009, and concluded that the claimant is able to lift fifty pounds occasionally, 25 pounds frequently, stand or walk for six hours in an eight hour work day and is unlimited in use of the left upper extremity and can frequently perform handling and fingering with the right upper extremity (Exhibits 13F and 19F). At the time of the hearing, the claimant was not taking the morphine he testified had previously been prescribed, and did not appear to be in significant pain.

(*PageID* 51.)  The opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  SSR 96-6p.  Consequently, opinions of one-time record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. §416.927(e).

24

For these reasons, the record contained substantial evidence supporting the administrative law judge's weighing of Dr. Olson's, Dr. Klyop's, and Dr. Manos' opinions.

Turning to Allen's arguments concerning his mental residual functional capacity, he argues that the administrative law judge was incorrect in rejecting Mr. Rain's opinion and "cherry picking" Dr. Kaufman's opinion.

With respect to the mental impairment opinion evidence, the administrative law judge stated:

> Little weight is given to the opinion of, Dr. Kaufman, the psychologist who examined the claimant at the request of the State agency, that "from a purely psychological perspective, the patient is unemployable" (Exhibit 2F p 7). The question of whether the claimant is unemployable is the ultimate issue reserved to the Commissioner. Dr. Kaufman also stated that the "impairments are expected to last 9 to 11 months" and the claimant's condition might improve with combined psychotropic medication and cognitive behavioral therapy (Exhibit 2F p 7). Little weight is also given to Dr. Kaufman's opinion that the claimant has marked impairment in ability to perform activities with a schedule and be punctual, the ability to work in coordination or proximity with others without being distracted by them, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes, and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (Exhibit 2F p 9). Some weight is given to Dr. Kaufmann's opinion that the claimant has moderate impairment of ability to sustain an ordinary routine without special supervision, to make simple work-related decisions, to ask simple questions or request assistance, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others (Exhibit 2F p 9). Great weight is given to Dr. Kaufman's opinion that the claimant has moderate impairment of ability to understand, remember, and carry out detailed

instructions and to maintain concentration for extended periods, but no significant impairment of ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions (Exhibit 2F p 9).

Little weight is also given to the opinion of Mr. Rain, the psychologist who conducted a second psychological evaluation by on October 27, 2008 at the request of the State agency, as to marked impairment in all areas. The claimant reported no history of alcohol or drug involvement, exhibited sad and withdrawn features, and was diagnosed with dysthymic disorder of moderate severity (Exhibit 9F). Mr. Rain assessed and a global assessment of functioning score of 50, but also stated "although from a functional perspective he appears to rate a GAF of 75 because he seems to have developed maintenance levels of function with his condition and reports he can lead an independent lifestyle" (Exhibit 9F p 6). The claimant provided an inaccurate history, and Mr. Rain's conclusion as to degree of impairment was not consistent with his findings.

Great weight is given to the opinions of the State agency psychologists who reviewed the records available on November 19, 2008 and April4, 2009 and concluded that the claimant has an affective disorder, dysthymic disorder, with mild restriction of activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation (Exhibits 10F and 15F). The State agency psychologists also concluded that the claimant's mental impairment would not prevent him from understanding, recalling, and performing simple repetitive tasks on a routine basis or from adapting to a relatively static work-like setting where there are no strict production quotas and where the required interactions with others are minimal (Exhibits 11F and 15F). This opinion is more consistent with the evidence as a whole, including the claimant's testimony.

(*PageID* 51-52.)

Based on the administrative law judge's consideration of the record evidence as a whole, he reasonably concluded that plaintiff was limited to no more than simple, routine, repetitive tasks with no production rate or pace work and no more than

occasional interaction with the public and with coworkers. These limitations are consistent with those in the opinions of the reviewing psychologists, Dr. Johnston and Dr. Tishler, who concluded that Allen could understand, recall and perform simple repetitive tasks on a routine basis, and that he could adapt to "a relatively static work like setting where there are no strict production quotas and where the required interactions with others are minimal." (*PageID* 426.)  The administrative law judge reasonably relied on these medical source opinions as he believed their opinions best reflected an evaluation of the record evidence as a whole and accounted for plaintiff's credible limitations.  (*PageID* 52.)  *See* 20 C.F.R. § 416.927(e).

In further support of his mental residual functional capacity determination, the administrative law judge noted that Allen had not received any mental health treatment.  The administrative law judge also observed that Allen's reported activities including watching movies and drinking beer and visiting with his girlfriend's cousins which are not consistent with more than moderate impairment of concentration or of ability to get along with others.  (*PageID* 51.)

The Court finds that the mental residual functional capacity as determined by the administrative law judge is supported by substantial evidence. Although the mental residual functional capacity selected by the administrative law judge might not be the same residual functional capacity that plaintiff would have selected, the administrative law judge clearly explained his rationale, and the residual functional capacity is, without question, within the permissible "zone of choice" which the Sixth Circuit

27

discussed in *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir.1994).  The administrative law judge's residual functional capacity is thus not subject to reversal.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

           s/Mark R. Abel                
           United States Magistrate Judge

28